1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9    Elaine Munoz Sanchez,                )    No. CV-09-1150-PHX-LOA
                                          )
10            Plaintiff,                   )    **ORDER**
                                          )
11   vs.                                   )
                                          )
12                                         )
                                          )
13   Joseph Arpaio, et al.,                )
                                          )
14            Defendants.                  )
                                          )
15   _____)

16

17           This matter arises on the Motion of Defendants Deputy Brian Woolf,

18   Deputy Robert Kent, Sheriff Arpaio, and Maricopa County for Summary Judgement.

19   Based Upon Qualified Immunity. (Doc. 51)  Plaintiff opposes the motion. (Doc. 72)  All

20   parties have consented in writing to magistrate-judge jurisdiction pursuant to 28 U.S.C. §

21   636(c)(1).  After consideration of the parties' briefing, the Court will grant the Motion in

22   part and deny it in part.

     **I.  Background**
23
             In her Complaint, Plaintiff Elaine Munoz Sanchez ("Plaintiff") asserts
24
     violations of her federal constitutional rights and also alleges several state law claims
25
     against Defendants Joseph M. Arpaio, Sheriff of Maricopa County; Robert Kent, Deputy
26
     Sheriff of Maricopa County Sheriff's Office ("MCSO"); Brian Woolf, Deputy Sheriff of
27
     MCSO; the Maricopa County Sheriff's Office; and Maricopa County, Arizona.  (Doc. 1)
28

1    Plaintiff's claims arise out of her arrest on May 28, 2008.  She seeks monetary damages
2    under 42 U.S.C. § 1983 and Arizona law.  The Complaint contains nine causes of action:
3    (1) Count One - violation of 42 U.S.C. § 1983 and deprivation of her rights under the
4    Fourth and Fourteenth Amendments; (2) Count Two - negligent supervision and/or
5    training; (3) Count Three - negligent hiring; (4) Count Four - assault; (5) Count Five -
6    battery; (6) Count Six - false arrest and false imprisonment; (7) Count Seven - negligence
7    and gross negligence; (8) Count Eight - abuse of process/malicious prosecution; and (9)
8    Count Nine - deprivation of State constitutional rights.  (Doc. 1)

9            Defendants Deputy Woolf, Deputy Kent, Sheriff Arpaio, and Maricopa
10   County move for summary judgment in their favor on Count One on qualified immunity
11   grounds.  (Doc. 51)  Because the Court has already granted Defendant Maricopa County's
12   separate summary judgment motion as to Count One, the Court will deny, as moot, the
13   pending Motion for Summary Judgment as it pertains to Maricopa County. (Doc. 80)

14   **II.  Facts**

15           Because this matter arises on Defendants' Motion for Summary Judgment,
16   the Court presents the facts in the light most favorable to Plaintiff.  *Adams v. Speers*, 473
17   F.3d 989, 990-91 (9th Cir. 2007).  On May 28, 2008, at approximately 1:00 a.m., Deputies
18   Kent and Woolf were patrolling in a marked car in the Town of Guadalupe, Arizona.
19   (Doc. 52, DSOF ¶ 1; Doc. 73, PSOF ¶ 3-4)  Deputy Woolf was the Field Training Officer
20   ("FTO") assigned to Deputy Kent that evening.  (*Id.*)  Deputy Woolf was training Deputy
21   Kent in the proper procedures for traffic stops.  (Doc. 52, SOF ¶ 1; Doc. 73, PSOF ¶ 5-6)
22   Deputy Kent was driving and had control of the radio.  (Doc. 73, PSOF ¶ 4)

23           At that same time, Plaintiff was driving home from eating at the Native
24   New Yorker restaurant in Tempe, Arizona with her husband, Manuel Valenzuela.  (Doc.
25   73; PSOF ¶ 9)  Plaintiff's brother, Andrew Sanchez, had also been with Plaintiff at the
26   restaurant.  (Doc. 73; PSOF ¶ 10)  Plaintiff's brother had driven the van that Plaintiff was
27   driving several days earlier and had been stopped by police for a light being out.  (Doc.
28   73, PSOF ¶ 12)  Although which light was out has not identified, Andrew discovered a

brake light was not functioning properly and had it repaired before May 28, 2008.  (Doc. 52, DSOF ¶ 5) Because Plaintiff knew there had recently been problems with the van's lights, she routinely checked to make sure they were working.  On May 28, 2008, she checked the van's lights and confirmed they were working before leaving the Native New Yorker to drive home.  (*Id*., DSOF ¶ 6; Doc. 73, PSOF ¶ 13-14)

After leaving the restaurant, Plaintiff drove to Guadalupe and stopped at a stop sign at a street named Calle Iglesias. While stopped, Plaintiff observed a marked Maricopa County Sheriff's vehicle approaching in the opposite direction.  She continued driving and saw the MCSO vehicle u-turn and proceed to follow her.  (Doc. 73, PSOF ¶ 15)  Deputy Kent reportedly observed Plaintiff's van in his rearview mirror and noticed that the rear license plate was not illuminated.  (*Id*.)  Deputy Kent u-turned and started following Plaintiff's van.  He was able to read the license plate because it was illuminated by his own head-lights and called the license plate number into the dispatcher to make sure it was safe to stop the van, *i.e*., that it was not reported stolen and there were no outstanding warrants for the vehicle which would dictate against turning on the police vehicle's emergency lights that might prompt a driver to take evasive action.  (Doc. 52, DSOF ¶ 1; Doc. 73, PSOF ¶ 23, ¶ 31-33 - citing Kent deposition, pg. 40, 42, 44, 46, 50)

According to Plaintiff, the MCSO vehicle did not activate its emergency lights or attempt to stop her van from the point she first saw the MCSO vehicle until she had turned into her home's driveway.  (Doc. 73, PSOF ¶ 29)  Kent, on the other hand, states that he activated the emergency lights just before Plaintiff pulled into her driveway.  (PSOF ¶ 23, ¶ 31-33)  Plaintiff states that the emergency lights were not turned on until she was handcuffed and had been taken to the police vehicle.  (Doc. 73; PSOF ¶ 29)

Plaintiff turned into her driveway, drove to the back of the house, and parked the van.  (Doc. 52, DSOF ¶ 2; Doc. 73, PSOF ¶ 37)   Plaintiff and her husband exited the van and Plaintiff proceeded to the back door of her residence. After Plaintiff had parked and exited her vehicle, the Deputies drove into her driveway - without activating the emergency lights. "At that time the Deputies only had their headlights on."

1   (Doc. 73, PSOF ¶ 44; Exh. D, Plaintiff's depo, page 34 lines 5-13)  "When she saw the

2   Deputies, Plaintiff was very confused and afraid and banged on the door of her house

3   yelling for her mother" because she needed witnesses. (*Id*., PSOF ¶¶ 44, 45, Plaintiff's

4   Affidavit ¶ 7) Plaintiff was not able to enter the back because it was locked. (*Id*., PSOF ¶

5   57)  When Plaintiff was at the back door of her residence, banging on the door and yelling

6   for her mother, Deputy Woolf "grabbed [Plaintiff] by the arm and then forced [her]

7   towards [her] van and pushed [her] against [her] van."  (*Id*.; PSOF ¶ 46, Plaintiff's depo,

8   page 34, lines 11-16)

9           Plaintiff, who was 32 years of age, is 5'2" and weighed 160 pounds, "was

10  struggling" because Deputy Woolf "was using too much force on her but she was not

11  trying to get away and didn't try to run or anything."  (*Id*., PSOF ¶¶ 8, 47, 51, Plaintiff's

12  depo, page 34, lines 23-25)   Then both "Deputies pushed her down to the ground and

13  used force on her" by "slamm[ing] her face on the dirt." (*Id*.; PSOF ¶ 48, Plaintiff's depo,

14  page 34, lines 23-25; Plaintiff's Affidavit ¶ 9)  One Deputy had his knee on her back, and

15  the other one held her down.  (*Id*., PSOF ¶ 50, Plaintiff's depo, page 35, lines 1-3)

16  Plaintiff described the force used as "significant,"causing her "pain, fear, and shock."

17  (*Id*., Plaintiff's Affidavit ¶ 10)

18          Defendants offer a different version of the events.  According to Deputy

19  Kent, he activated the MCSO vehicle's emergency lights before following Plaintiff's van

20  into her driveway.  When Plaintiff and the passenger started to exit the vehicle, Deputies

21  Kent and Woolf ordered them to return to the vehicle several times, but they did not

22  comply.  Plaintiff did not respond to Deputy Kent's order, but proceeded to the back door,

23  tried to open the door, and then started knocking on the door and yelling "mom."  (*Id*.,

24  PSOF ¶ 57, Kent depo, page 57-58, 62)   Deputy Woolf then grabbed Plaintiff's left arm

25  to escort her back to the van.  Because Plaintiff "was slightly resisting" and non-

26  compliant, Deputy Woolf grabbed her other arm and escorted back to the van because,

27  not knowing who or what was inside the house, he wanted her away from the house.  (*Id*.,

28  PSOF ¶ 59, Kent depo, page 59, lines 4-10)  Deputy Woolf took Plaintiff to her vehicle

- 4 -

1  and, within seconds, Plaintiff "attempted to sprint back to the house again," so it was

2  necessary to take her to the ground and handcuff her.  (*Id*., PSOF ¶ 59, ¶ 63, Woolf depo,

3  page 59)  Deputy Kent also states that Plaintiff was actively trying to get away from them

4  by pushing and pulling her arms away from the Deputies and yelling,"somebody help

5  me."  (*Id*.; PSOF ¶¶ 61, 64, Kent depo, page 58-62)  The Deputies then took Plaintiff to

6  the ground by each taking an arm and trying to take her off balance and put her on the

7  ground in a "controlled fall."  (*Id*., PSOF ¶ 62, Kent depo, page 64)

8         Plaintiff was placed in the back of the patrol car, advised she was under

9  arrest, and transported to the Guadalupe substation where she was cited for Disorderly

10  Conduct, a misdemeanor, in violation of Arizona Revised Statute ("A.R.S.") § 13-

11  2904(A)(1), interviewed, and released about 30 minutes later.  (Doc. 1; Doc. 73, PSOF ¶¶

12  67-68, ¶ 72, Exh. G)  The disorderly conduct charge was subsequently dismissed in the

13  Guadalupe Justice Court.  (Doc. 73, PSOF ¶ 74)

14  **III.  Summary Judgment Standard**

15         A moving party may, at any time, move for summary judgment on all or

16  any part of a claim.  Fed.R.Civ.P. 56.  The Court may only grant summary judgment if the

17  pleadings and supporting documents, viewed in the light most favorable to the non-

18  moving party, determines that "there is no genuine issue of material fact and that the

19  moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); *Celotex*

20  *Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Substantive law determines which facts

21  are material.  *Anderson v. Liberty Lobby, Inc*., 447 U.S. 242, 248 (1986). "Only disputes

22  over facts that might affect the outcome of the suit under the governing law will properly

23  preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  In considering the

24  evidence, the Court is not to weigh the evidence and determine the truth of the matter, but

25  to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  The

26  moving party need not disprove matters on which the opponent has the burden of proof at

27  trial.  *Celotex*, 477 U.S. at 323.

28

1    The party opposing summary judgment "may not rest upon the mere
2    allegations or denials of [the party's] pleadings, but . . . must set forth specific facts
3    showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Matsushita Elec.*
4    *Industries Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 685-87 (1986).  There is no
5    genuine issue for trial unless there is sufficient evidence favoring the non-moving party.
6    If the evidence is merely colorable or is not significantly probative, summary judgment
7    may be granted.  *Anderson*, 477 U.S. at 249-50.  However, "[t]he evidence of the non-
8    movant is to be believed, and all justifiable inferences are to be drawn in his [or her]
9    favor."  *Id.* at 255.  Allegations of civil rights violations are to be liberally construed.
10    *Thomas v. Youngblood*, 545 F.2d 1171, 1192 (9th Cir. 1976).

11    When considering a motion for summary judgment based on qualified
12    immunity, district "courts are required to view the facts and draw reasonable inferences
13    'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott*
14    *v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (citations omitted). "However,
15    when the facts, as alleged by the non-moving party, are unsupported by the record such
16    that no reasonable jury could believe them, we need not rely on those facts for purposes
17    of ruling on the summary judgment motion." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th
18    Cir. 2010) (citing *Scott*, 550 U.S. at 380); *City of Vernon v. Southern Cal. Edison Co.*,
19    955 F.2d 1361, 1369 (9th Cir. 1992), *cert. denied*, 506 U.S. 908 (1992) (a party cannot
20    defeat a summary judgment motion by producing a "mere scintilla of evidence to support
21    its case.").

22    **IV.  Analysis of Qualified Immunity**

23    Police officers and other state officials are entitled to qualified immunity
24    from section 1983 suits. *Davis v. Scherer*, 468 U.S. 183, 194 n. 12 (1984); *Wood v.*
25    *Ostrander*, 879 F.2d 583, 591 (9th Cir. 1989).  "Qualified immunity balances two
26    important interests - the need to hold public officials accountable when they exercise
27    power irresponsibly and the need to shield officials from harassment, distraction, and
28    liability when they perform their duties reasonably. The protection of qualified immunity

- 6 -

1    applies regardless of whether the [police officer's] error is a mistake of law, a mistake of

2    fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, ___

3    U.S.___, 129 S.Ct. 808, 815 (2009) (citation and internal quotation marks omitted).

4              In *Saucier v. Katz*, 533 U.S. 194 (2001), *receded from by Pearson v.*

5    *Callahan*, ___ U.S.___, 129 S.Ct. 808, 815 (2009), the Supreme Court instructed lower

6    courts deciding summary judgment motions based on qualified immunity to consider "this

7    threshold question: Taken in light most favorable to the party asserting the injury, do the

8    facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201.  If not,

9    then "there is no necessity for further inquiries concerning qualified immunity."  *Id*. If so,

10   then "the next, sequential step is to ask whether the right was clearly established." *Id*.  A

11   constitutional right is clearly established when, "on a favorable view of the other parties'

12   submissions" "it would be clear to a reasonable officer that his conduct was unlawful in

13   the situation he confronted."  *Id*.

14             If the right is not clearly established, the individual public officials are

15   entitled to qualified immunity if a reasonable official could have believed that his or her

16   conduct was lawful.  *Thompson v. Souza*, 111 F.3d 694, 698 (9th Cir. 1997).  The Supreme

17   Court's 2009 decision in *Pearson*, clarified that a district court is "permitted to exercise

18   [its] sound discretion in deciding which of the two prongs of the qualified immunity

19   analysis should be addressed first in light of the circumstances in the particular case at

20   hand." *Pearson*, 129 S.Ct. at 818.  The Court will consider the pending motion for

21   summary judgment in view of the foregoing principles.

22             **A. Traffic Stop**

23             Plaintiff alleges that Defendants Woolf and Kent violated the Fourth

24   Amendment because they lacked reasonable suspicion to conduct a traffic stop. Deputies

25   Woolf and Kent assert that they are entitled to qualified immunity on this claim because

26   they had "probable cause" to initiate a traffic stop.  (Doc. 51 at 7)  "The temporary

27   detention of individuals during an automobile stop by the police, even if only for a brief

28   period, constitutes a seizure within the meaning of the Fourth Amendment. Therefore, an

1   auto-mobile stop is subject to the Constitutional requirement that the seizure not be

2   'unreason-able' under the circumstances." *Litzenberger v. Vanim*, 2002 WL 1759370

3   (E.D.Pa. 2002) (citing *Whren v. United States*, 517 U.S. 806, 809-10 (1996)). Traffic

4   stops are investigatory stops, which require only a showing of reasonable suspicion, *i.e.*,

5   whether under the totality of the circumstances, Deputies Kent and Woolf had a

6   reasonable suspicion that a traffic law violation occurred. *United States v. Willis*, 431

7   F.3d 709, 714 (9th Cir. 2005); *United States v. Miranda-Guerena*, 445 F.3d 1233, 1237-

8   38 (9th Cir. 2006) (a traffic stop may be based on traffic violations observed by another

9   officer). *See also Terry v. Ohio*, 392 U.S. 1, 23-27 (1968) (recognizing that a limited stop

10  and frisk of an individual could be conducted without a warrant based on less than

11  probable cause); *Arizona v. Johnson*, ___ U.S.___, 129 S.Ct. 781, 784 (2009) (permitting

12  a limited stop "when the police officer reasonably suspects" a traffic violation); *United*

13  *States v. Lopez- Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000) ("[T]he Fourth Amendment

14  requires only reasonable suspicion in the context of traffic stops."). Reasonable suspicion

15  requires "specific, articulable facts which, together with objective and reasonable

16  inferences, form a basis for suspecting that a particular person is engaged in criminal

17  conduct." *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (internal

18  quotations omitted). Reasonable suspicion is less than probable cause, but more than an

19  "inchoate and unpar-ticularized suspicion or 'hunch.'" *United States v. Sokolow*, 490 U.S.

20  1, 7 (1989) (quoting *Terry*, 392 U.S. at 27).

21          Here, Deputy Kent had reasonable suspicion that Plaintiff had violated

22  Arizona's traffic laws. Specifically, that Plaintiff violated A.R.S. § 28-925(C) which

23  provides that:

24          Either a tail lamp or a separate lamp shall be constructed and placed
            in a manner that illuminates with a white light the rear license plate
25          and renders it clearly legible from a distance of fifty feet to the rear.
            A tail lamp or tail lamps together with any separate lamp for
26          illuminating the rear license plate shall be wired to provide that the
            tail lamp or lamps are lighted whenever the head lamps or auxiliary
27          driving lamps are lighted.

28  A.R.S. § 28-925 (West 2010) (Although § 28-925 was amended in 2009, the amendment

1   did not change the relevant portion of that statute, *see* AZ LEGIS 187 (2009)).

2       At about 1:00 a.m. on May 28, 2008, Deputies Kent and Woolf were patrolling in

3   a marked MCSO vehicle in Guadalupe, Arizona. Deputy Kent, who was driving,

4   observed Plaintiff's van in his rear view mirror and noticed that the rear license plate light

5   was not illuminated as is legally required. Deputy Kent shared this information with

6   Deputy Woolf who instructed Kent to stop the vehicle. Deputy Kent u-turned and fol-

7   lowed Plaintiff's vehicle. Deputy Kent did not see the license plate illuminated by its own

8   lighting. Plaintiff, who admittedly knew there had recently been problems with her van's

9   lights, argues that she had checked the lights before driving home and noted that all the

10   lights were working. Plaintiff's statements, however, regarding checking the lights before

11   driving that night and her opinion that the license plate light was in working order does

12   not undermine the existence of reasonable suspicion to conduct a traffic stop. Plaintiff

13   was inside her vehicle at the relevant time and was not in a position to observe whether

14   her license plate was properly illuminated at the moment the Deputies drove behind her

15   vehicle.  Other then her own speculation, Plaintiff has not provided any evidence to create

16   a genuine issue of material fact regarding whether Deputy Kent had noticed that the

17   license plate was not illuminated. "Prior to an investigatory stop a police officer is not

18   required to have absolute certainty, or even probable cause, that wrongdoing has oc-

19   curred; rather, the officer is required to have merely reasonable suspicion." *Houston v.*

20   *City of Coquille,* 2007 WL 4287769 (D.Or., 2007) (finding that officer had reasonable

21   suspicion to stop plaintiff for failure to have proper light illuminating license plate).

22   Deputy Kent observed the absence of proper lighting on the license plate before following

23   Plaintiff's vehicle into her driveway.  The law allows an officer to conduct an

24   investigatory traffic stop if he or she has a reasonable suspicion to believe that an offense

25   has occurred.  Deputy Kent's observations provided him reasonable suspicion to believe

26   that Plaintiff violated Arizona's traffic laws. *United States v. Choudhry*, 461 F.3d 1097,

27   1100 (9th Cir. 2006) ("A traffic violation alone is sufficient to establish reasonable

28   suspicion."); *United States v. Padilla*, 2010 WL 1859988 (D.Ariz. 2010) (finding police

1    officer had reasonable suspicion to stop a driver for lack of illuminated license plate).

2    Therefore, a traffic stop was authorized and there was no violation of Plaintiff's Fourth

3    Amendment rights based on the investigatory traffic stop.  Because Plaintiff fails to create

4    a question of fact regarding a constitutional violation based on the initial traffic stop,

5    Defendants are immune from suit on this claim.  *Saucier*, *supra*.

6                                    **B.  Probable Cause to Arrest**

7              Plaintiff also alleges that Deputies Woolf and Kent violated the Fourth

8    Amendment because they lacked probable cause to arrest her for disorderly conduct.

9    "Unsurprisingly, it is clearly established that an arrest without probable cause violates a

10   person's Fourth Amendment rights." *Knox v. Southwest Airlines,* 124 F.3d 1103, 1107 (9th

11   Cir. 1997) (citing *Los Angeles Police Dep't*, 901 F.2d 702, 706 (9th Cir. 1989)); *Turner v.*

12   *County of Washoe*, 759 F.Supp. 630, 634 (D.Nev. 1991) (stating that "a police officer

13   who arrests without probable cause has committed a civil rights violation."). The Court,

14   therefore, will consider whether the facts show that the Deputies' conduct violated the

15   Fourth Amendment.

16             Defendants claim that they had probable cause to arrest Plaintiff for

17   violating Arizona's disorderly conduct statute. Resolving all factual disputes and drawing

18   all reasonable inferences in Plaintiff's favor, the Court concludes that there is a triable

19   issue of fact regarding probable cause for the arrest.  The elements of Disorderly Conduct

20   are knowingly or intentionally disturbing the peace by any of several categories of

21   conduct.  A.R.S. § 13-2904.[1]   The record indicates that Plaintiff was cited for violating

22

23             [1] Arizona's disorderly conduct statute provides:

24             **A.** A person commits disorderly conduct if, with intent to disturb the
               peace or quiet of a neighborhood, family or person, or with knowledge
25             of doing so, such person:

26
27             1. Engages in fighting, violent or seriously disruptive behavior; or

28             2. Makes unreasonable noise; or

1    A.R.S. § 13-2904(A)(1) which provides that "[a] person commits disorderly conduct if,

2    with the intent to disturb the peace or quiet of a neighborhood, family or person, or with

3    know-ledge of doing so, such person . . . [e]ngages in fighting, violent or seriously

4    disruptive behavior." *Id.*

5            In determining whether an arrest was lawful under the Fourth Amendment,

6    "[f]ederal law asks only whether the officers had probable cause to believe that the

7    predicate offense, as the state has defined it, has been committed." *Williams v. Jaglowski*,

8    269 F.3d 778, 782 (7th Cir. 2001).  "Probable cause exists if 'at the moment the arrest

9    was made . . . the facts and circumstances within [the police officer's] knowledge and of

10   which [the police officer] had reasonably trustworthy information were sufficient to

11   warrant a prudent man in believing' that [the arrestee] had violated [the law]." *Hunter v.*

12   *Bryant*, 502 U.S. 224, 228 (1991) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "The

13   validity of the arrest does not depend on whether the suspect actually committed a crime;

14   the mere fact that the suspect is later acquitted of the offense for which [s]he is arrested  is

15   irrelevant to the validity of the arrest. We have made clear that the kinds and degree of

16   proof and the procedural requirements necessary for a conviction are not prerequisites to

17   _____

18            3. Uses abusive or offensive language or gestures to any person present in a
             manner likely to provoke immediate physical retaliation by such person; or
19

20            4. Makes any protracted commotion, utterance or display with the intent to
             prevent the transaction of the business of a lawful meeting, gathering or
21           procession; or

22            5. Refuses to obey a lawful order to disperse issued to maintain public safety
             in dangerous proximity to a fire, a hazard or any other emergency; or
23

24            6. Recklessly handles, displays or discharges a deadly weapon or dangerous
             instrument.
25

26   A.R.S. § 13-2904.  Disorderly conduct, without the use of a weapon or dangerous instrument,

27   is a Class 1 misdemeanor and carries a maximum term of incarceration of six months. A.R.S.
     §§ 13-2904(B), 13-707(A)(1).

28

a valid arrest." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979) (citations omitted); *Wright v. City of Philadelphia*, 409 F.3d 595, 603-04 (3d Cir. 2005) (noting it is irrelevant to the probable cause analysis what crime a suspect is eventually charged with, and finding no constitutional violation where probable cause supported one of the four charges on which the defendant was arrested); *Beauregard v. Wingard*, 362 F.2d 901, 903 (9th Cir. 1996).  Thus, the fact that the disorderly conduct charge against Plaintiff was later dis-missed, is not relevant to determining the existence of probable cause at the time of arrest.

Whether a police officer has probable cause to arrest is ascertained by looking at the facts known to the officer at the time of the arrest. *Turner*, 759 F.Supp. at 634.  In Arizona, a police officer may execute a warrantless arrest if the officer has probable cause to believe:

> 1.  A felony has been committed and probable cause to believe the person to be arrested has committed the felony.
>
> 2.  A misdemeanor has been committed in his presence and probable cause to believe the person to be arrested has committed the offense.
>
> *          *          *          *
>
> 4. A misdemeanor or a petty offense has been committed and probable cause to believe the person to be arrested has committed the offense. . . .
>
> B. A peace officer may stop and detain a person as is reasonably necessary to investigate an actual or suspected violation of *any traffic law* committed in the officer's presence and may serve a copy of the traffic complaint for any alleged civil or criminal traffic violation. . . .

A.R.S. § 13-3883(A) (2010) (emphasis added)[2]; *State v. Keener*, 206 Ariz. 29, 75 P.3d 119, 121 (Az.Ct.App. 2003) (police officers had authority to arrest defendant for misdemeanor offense of driving with a suspended license, even though they did not witness defendant driving, provided they had probable cause to believe offense had occurred and defendant had committed it.).

---

[2] This statute was amended in 2010 but the amendment did not change the version that is applicable to this case.

Construing all evidence in Plaintiff's favor, an ordinarily prudent officer could not reasonably have concluded Plaintiff had committed the offense of Disorderly Conduct. The incident happened at 1:00 a.m. in the back of Plaintiff's own residence. Although the Deputies contend that Plaintiff actively ("slightly") struggled against them and resisted, the Court must accept Plaintiff's version that she only minimally struggled with the Deputies.  Moreover, there is no evidence that Plaintiff engaged in "fighting" or "violent" behavior.  A.R.S. § 13-3904(A)(1).  Plaintiff's conduct - yelling, "mom," and banging on the back door of her own home for a few moments - is unlikely to constitute "unreasonable noise" or a "protracted commotion" with the intent or knowledge of disturbing a person for purposes of violating either subsection 2 or 3 of the disorderly conduct statute. *Theilen v. Maricopa County*, 2010 WL1743961 (D.Ariz. 2010) (stating that clapping for a short period at a public meeting is unlikely to constitute "unreasonable noise" or "protracted commotion" with the intent or knowledge of disturbing a person, and that concluding that plaintiffs adequately allege that they were arrested without probable cause.); A.R.S. § 13-2904(A).

Under Supreme Court law, an arrest is lawful even though there is no probable cause to support the offense cited by the arresting officer so long as the facts known to the officer establish probable cause for some offense, even if that offense is not closely related.  *Devenpeck v. Alford*, 543 U.S. 146, 153-56 (2004). In *Devenpeck*, the Supreme Court held that an officer's subjective intent for an arrest is irrelevant: Even if probable cause did not exist with respect to the stated basis for the arrest, the arrest is valid if any valid basis existed. *Id.*

To the extent Defendants argue that there was probable cause to arrest Plaintiff for resisting arrest, there are material questions of fact that preclude summary judgment on that issue.  Under Arizona law, resisting arrest by a peace officer is a Class 6 felony. A.R.S. § 13-2508(B). The statute "plainly states that 'a person commits resisting arrest by intentionally *preventing* or attempting to *prevent*' an arrest by a police officer if

either (A)(1) or (A)(2) is satisfied." *State v. Lee*, 217 Ariz. 514, 176 P.3d 712 (Az.Ct.App. 2008) (quoting A.R.S. § 13-2508(A) (emphasis in original)).

> [T]he language of subsection (A)(1) does not require any particular type of physical conduct so long as that conduct qualifies as "physical force against the peace officer or another." A.R.S. § 13-2508(A)(1). Those who use physical force against police officers attempting to arrest them are not entitled to engage in "minor scuffling" whether it is usual or unusual in the context of an arrest. This is consistent with our prior decisions. See *State v. Stroud*, 207 Ariz. 476, 480-81, ¶¶ 15-17, 88 P.3d 190, 194-95 (App.2004) (In attempting to flee from an arrest, the defendant was "kicking his feet" and "pushing on [the officer's] arm."), *rev'd on other grounds*, 209 Ariz. 410, 103 P.3d 912 (2005); *State v. Sorkhabi*, 202 Ariz. 450, 451-52, ¶¶ 2, 9-10, 46 P.3d 1071, 1072-73 (App.2002) (conviction for resisting arrest appropriate when "defendant struggled with" the arresting officers). . . .

*Lee*, 217 Ariz. at 517, 176 P.3d at 715 ("Lee's conduct in jerking her arm away from the officers, physically resisting the placement of the handcuffs, and kicking the officers after the handcuffs were placed, meets the (A)(1) requirement.").

Here, viewing the record in the light most favorable to Plaintiff, when Deputy Woolf grabbed Plaintiff's arm and when both Deputies forced her to the ground, the Deputies had not activated the MCSO vehicle's emergency lights or otherwise indicated to Plaintiff it was their intent to arrest her. *State v. Womack*, 174 Ariz. 108, 118, 847 P.2d 609, 615 (Ariz.Ct.App.1992) (defendant must be aware by officer's conduct that officer intends to effectuate an arrest). Although Plaintiff slightly struggled with Deputy Woolf, she was only attempting to move away from Deputy Woolf because he was using too much force on her. There is no evidence she used "physical force against" either of the Deputies, A.R.S. § 13-2508(A), or tried to hit or kick either of them. Plain-tiff disputes the Deputies' claim that she was non-compliant, tried to pull her arms away from the Deputies, and that she tried to run from them. In view of the conflicting versions of the events - whether Deputies had indicated their intent to arrest Plaintiff and the manner in which Plaintiff slightly struggled or resisted the Deputies - there are material issues of fact precluding summary judgment on the issue of probable cause to arrest. *State v. Stroud*, 207 Ariz. 476, 480-81, 88 P.3d 190, 194-95 (Az.Ct.App.2004),

*vacated on other grounds*, 209 Ariz. 410, 103 P.3d 912 (Ariz. 2005) (affirming conviction for resisting arrest where defendant struggled and was generally combative with officer trying to arrest him).

Defendants also argue that there was probable cause to arrest Plaintiff for failure to comply with a police officer's order.  Under Arizona law, the failure to comply with a police officer's lawful order is a Class 2 misdemeanor that carries up to four months in jail.[3] A.R.S. § 28-622(A) ("A person shall not wilfully fail or refuse to comply with any lawful order or direction of a police officer invested by law with authority to direct, control or regulate traffic.")   In 2009, the Arizona Court of Appeals in *State v. Gonzalez*, 221 Ariz. 82, 84, 210 P.3d 1253, 1255 (Az.Ct.App. 2009) determined that the misdemeanor offense of Failure to Obey a Police Officer pursuant to A.R.S. § 28-622 "requires proof that: (1) a person (2) wilfully (3) failed or refused to comply with (4) any lawful order or direction (5) of a police officer invested by law with authority to direct, control or regulate traffic." 210 P.3d at 1255. Arizona law is not clear, however, whether A.R.S. § 28-622(A) is limited to police orders related to directing, controlling, or regulating vehicular traffic and the operators of motor vehicles.[4] Arguably, if Plaintiff's version of the events are believed, A.R.S. § 28-622(A) may be inapplicable because Plaintiff's van was stopped, parked on private property off the public roadway, and she was out of the van at or near her back door when the Deputies ordered her to return to her van. Even if A.R.S. § 28-622(A) were sufficiently related to directing, controlling, or regulating vehicular traffic to empower the Deputies to give Plaintiff a lawful order,

---

[3] *See* A.R.S. 13-707(A)(2) (stating that the sentence for "a class 2 misdemeanor" is "four months.").

[4] This Court's recent ruling in *Bohnert v. Mitchell*, 2010 WL 3767566, * 9 (D.Ariz. 2010) is not inconsistent with this ruling. *Bohnert* involved a wrong-way driver on Interstate 8 who was ordered to exit his vehicle while the vehicle was still on the roadway. Clearly, the DPS officer's order in *Bohnert* was directly related to "direct[ing], control[ling], or regulat[ing] traffic" and the operator of the vehicle. A.R.S. § 28-622.

1   summary judgment is inappropriate.

2          Here, the facts are disputed regarding at what point the Deputies

3   communicated to Plaintiff that they intended to conduct a traffic stop. According to

4   Plaintiff's version of the facts, the Deputies drove behind her without turning on their

5   emergency lights or otherwise signaling Plaintiff to stop the van.  Plaintiff drove into her

6   driveway, proceeded to drive to the back of her house, exited and stepped away from her

7   van before the Deputies entered her property and, at that point, the Deputies still had not

8   activated their emergency lights.  According to Plaintiff, it was at this time that the

9   Deputies directed Plaintiff to return to her van.  Plaintiff admits, however, that, rather

10  than complying with the Deputies' order, she took "two steps" to the back door of her

11  house and banged on the door and yelled for her mother.  (Doc. 73-5, Sanchez depo, page

12  34)  Although Defendants contend that Deputy Kent activated the emergency lights just

13  before the Deputies pulled into the drive-way behind Plaintiff, they observed Plaintiff exit

14  the van and directed her to return to the vehicle – an order she admittedly ignored -- the

15  Court must accept Plaintiff's version of the facts on summary judgment.

16         Viewing the record in the light most favorable to Plaintiff, the Court will

17  deny Defendants' Motion for Summary Judgment on the basis of qualified immunity on

18  Plaintiff's claim that Defendants' lacked probable cause to arrest her in violation of the

19  Fourth Amendment. Assuming *arguendo* that A.R.S. § 28-622(B) applies to this case,

20  whether taking two steps while on private property after the Deputies directed Plaintiff to

21  return to her van and whether Plaintiff's conduct under the circumstances was "wilful"

22  sufficiently establish probable cause to arrest the scared Plaintiff for the crime of Failure

23  to Obey a Police Officer pursuant to A.R.S. § 28-622, a crime for which Plaintiff was not

24  cited, is for a jury to decide.

25  **C.  Excessive Force**

26         Plaintiff further claims that the Deputies used excessive force in arresting

27  her in violation of the Fourth Amendment.  The Ninth Circuit has held that a § 1983 claim

28

may be based upon the Fourth Amendment if the police used excessive force during an arrest. *Robins v. Harum*, 773 F.2d 1004 (9th Cir. 1985). Police officers may only use force that is objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386 (1989). In the Ninth Circuit, courts evaluate claims of excessive force under the objective reasonableness standard. *Pierce v. Multnomah County*, 76 F.3d 1032, 1043 (9th Cir. 1996). "[T]he reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Trial courts must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal citations omitted). Assessing the "nature and quality" of a given "intrusion" requires the fact finder to evaluate the "type and amount of force inflicted." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994). The governmental interest is measured by considering: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; (3) whether the suspect was actively resisting arrest, and any other exigent circumstances present at the time. *Graham*, 490 U.S. at 394; *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001). Because this balancing "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit] has held on many occasions that summary judgment or judgment as a matter of law in exces-sive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

Defendants argue that they are entitled to qualified immunity on Plaintiff's claim of excessive force. The Court must determine, viewed in the light most favorable to Plaintiff, whether the facts alleged show the Deputies' conduct violated a constitutional right. *Saucier*, 533 U.S. at 201. Where the facts are disputed, their resolution and determinations of credibility "are manifestly the province of the jury." *Santos*, 287 F.3d

1    at 852.

2           It is clearly established that "[t]he use of excessive force by police officers

3    in an arrest violates the arrestee's Fourth Amendment right to be free from an

4    unreasonable seizure."  *White v Pierce County*, 797 F.2d 812, 816 (9th Cir. 1986).  Here,

5    Plaintiff contends that Defendant Woolf grabbed her arm and forced her back to her

6    vehicle.  Plaintiff, who is 5'2" and weighed 160 pounds, slightly struggled because

7    Deputy Woolf "was using too much force," but, according to Plaintiff, she did not try to

8    run.  Deputy Kent and Woolf together forced her to the ground and slammed her face into

9    the dirt.  One Deputy had his knee on her back and the other held her down.  The

10   Deputies hand-cuffed Plaintiff while she was face down on the ground.  Plaintiff claims

11   that she neither resisted the Deputies nor struggled once arrested.  Although Plaintiff

12   admits she did not suffer a physical injury, the absence of a physical injury does not

13   defeat her claim of excessive force.  *Marlowe v. Pinal County*, 2008 WL 4264724

14   (D.Ariz. 2008) (finding that plaintiff's claim that he was never so upset or terrified during

15   the incident and that it was the worst thing that had ever happened to him outside the

16   death of his son, sufficient to support claim of excessive force); *Flores v. City of*

17   *Palacios*, 381 F.3d 391, 400-01 (5th Cir. 2004) (noting that psychological injuries can be

18   sufficient to support a claim of excessive force.).

19          Defendants tell a different story.  Defendants contend that when Plaintiff

20   and the passenger started to exit the vehicle, they were instructed several times to return

21   to the vehicle, but did not comply. Plaintiff did not respond to Deputy Kent's order, but

22   simply proceeded to the back door, tried to open the door, knocked on the door and yelled

23   for her "mom."  (Doc. 73, PSOF ¶ 57, Kent depo, page 57-58, 62)   Deputy Woolf states

24   that when he first contacted Plaintiff, he grabbed her left arm.  Plaintiff was slightly

25   resisting and non-compliant, so he grabbed her other arm and escorted back to the car

26   because, not knowing what was inside the house, he wanted her away from the house.

27   Deputy Woolf took Plaintiff to her vehicle and, within seconds, Plaintiff tried to "sprint"

28

back to her house, so it was necessary to take her to the ground and handcuff her.  (Doc. 73, PSOF ¶ 59, ¶ 63 Woolf depo, page 59)  Deputy Kent also states that Plaintiff was actively trying to get away from the Deputies by pushing and pulling her arms away from the Deputies and yelling, "somebody help me."  (Doc. 73; PSOF ¶ 61, 64, Kent depo, page 58-62)  The Deputies then took Plaintiff to the ground by each taking an arm and trying to take her off balance and put her on the ground in a "controlled fall."  (Doc. 73, PSOF ¶ 62, Kent depo, page 64)

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., Amend. IV. Viewing the record in the light most favorable to Plaintiff, a reasonable jury could find the Deputies violated her rights under the Fourth Amendment by using excessive and unnecessary force against her. If Plaintiff's version of the facts is believed, Defendants used excessive and unnecessary force during her arrest.

Under the qualified immunity analysis, "[i]f a [Constitutional] violation could be made out on a favorable view of the party's submissions" the Court must ask the next question: whether the right was clearly established.  *Saucier*, 533 U.S. at 201.  The doctrine of qualified immunity operates "to protect officers from the sometimes 'hazy border between excessive and acceptable force.'" *Id.* at 206.  "Because the focus is on whether the officer had fair notice that [the officer's] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or even the burdens of litigation. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) ("Of course, in an obvious case, the[] standards [enunciated in *Graham*] can 'clearly establish' the answer, even without a body of relevant case law"). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted."  *Saucier*, 533 U.S. at 202. The Fourth

Amendment prohibits a wide range of governmental intrusions on the person. "The Fourth Amendment's requirement that a seizure be reasonable prohibits more than the unnecessary strike of a nightstick, sting of a bullet, and thud of a boot." *Fontana v. Haskin*, 262 F.3d 871, 878 (9th Cir. 2001). Even "[t]he use of handcuffs is the use of force, and such force must be objec-tively reasonable under the circumstances." *Muehler v. Mena*, 544 U.S. 93, 102 (2005) (concurring opinion of Justice Kennedy citing *Graham*).

Plaintiff argues that, although she struggled a bit with Deputy Woolf, she did not resist arrest and she was not a threat to the safety of the Deputies or others.  The incident took place behind Plaintiff's own home.  There is no evidence that Plaintiff used, or threatened to use, force against the Deputies, or that she appeared to have any sort of weapon in her possession.  At most, Plaintiff posed a *de minimus* threat to the Deputies because she admittedly disregarded their order to return to her car when she was at or near her back door, unsuccessfully attempted to gain access to her residence, and the Deputies did not know who, or what, was inside the residence. *Chew*, 27 F.3d at 441(the "threat posed is the most significant *Graham* factor.")

The Deputies followed Plaintiff based on a very minor traffic violation - an improperly illuminated license plate. Plaintiff was charged with disorderly conduct, which is not a particularly serious crime.  The nature of the offense in this case provides little, if any, basis for the use of physical force. *Winterrowd v. Nelson*, 480 F.3d 1181, 1184, 1187 (9th Cir. 2007) (finding that no reasonable officer could conclude that a individual sus-pected of driving with expired license plates "posed a threat that would justify slamming him against the hood of a car" and stating that a "passive offense[]", such as failing to display a license plate, cannot give rise to a reasonable inference that the suspect is dangerous.).

The Ninth Circuit has repeatedly stated that whether the force used to arrest an individual is reasonable is "ordinarily a question of fact for the jury." *Liston v. County*

1  *of Riverside*, 120 F.3d 965, 976 n. 10 (9th Cir. 1997 ) (citing *Forrester v. City of San*

2  *Diego*, 25 F.3d 804, 806 (9th Cir. 1994)).  Viewing the record in the light most favorable

3  to Plaintiff on her excessive force claim, the Court finds that she has established the

4  existence of disputed issues of material fact which may only be resolved by a jury.

5  Because Plaintiff and the Defendants offer varying accounts of the events surrounding

6  Plaintiff's arrest - namely whether Plaintiff failed to obey the Deputies, resisted arrest,

7  tried to run from the Deputies, and whether the they forced her to the ground, slammed

8  her face into the ground, and placed a knee in her back and held her down, the Court finds

9  that summary judgment is inappropriate.

10  **V.  Claims Against Defendant Sheriff Arpaio**

11         Defendant Arpaio contends that he is entitled to summary judgment on

12  Count One.  Count One does not contain any specific allegations against Defendant

13  Arpaio.  (Doc. 1 at 6)   Rather, Plaintiff generally asserts that Sheriff Arpaio is

14  responsible for the actions of Maricopa County sheriff's deputies including, but not

15  limited to, Deputy Kent and Deputy Woolf.  (Doc. 1 at 3)  Plaintiff further asserts that

16  Sheriff Arpaio is "responsible for the actions of [his] individual deputies and employees

17  under the doctrine of *respondeat superior*."  (*Id. at* 16)

18         There is no *respondeat superior* liability under § 1983, and thus Sheriff

19  Arpaio cannot be held liable based solely on his position as Maricopa County Sheriff.

20  *Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989). It is undisputed Sheriff Arpaio

21  was not present during the incident at issue and thus had no personal involvement in

22  Plaintiff's arrest.  Because Plaintiff failed to raise a genuine issue of material fact as to

23  whether Sheriff Arpaio personally participated in, or had any knowledge, of the claimed

24  deprivations, or that he otherwise directed or set into motion the Deputies' actions - by a

25  policy or custom, the Court will grant summary judgment in favor of Defendant Arpaio

26  on Count One.  *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 691-94 (1978) (section 1983

27  does not impose liability upon state officials for the acts of their subordinates under a

28

1   *respondeat superior* theory of liability); Fed. R. Civ. P. 56(e) (The party opposing

2   summary judgment "may not rest upon the mere allegations or denials of [the party's]

3   pleadings, but . . . must set forth specific facts showing that there is a genuine issue for

4   trial.").

5   **VI.  Conclusion**

6          In conclusion, Defendants' Motion for Summary Judgment is denied, as

7   moot, as to Defendant Maricopa County in view of the prior order, doc. 80, granting

8   summary judgment to Maricopa County on Count One.  The Court will grant summary

9   judgment in favor of Defendant Arpaio on Count One and Defendants Kent and Woolf on

10  Plaintiff's allegations in Count One that the Deputies lacked reasonable suspicion to

11  conduct a traffic stop.  The Court will deny summary judgment on Plaintiff's Fourth

12  Amendment claims that Defendants Kent and Woolf lacked probable cause to arrest her

13  and used excessive force in effectuating her arrest.

14         Accordingly,

15         **IT IS ORDERED** that Motion of Defendants Deputy Woolf, Deputy Kent,

16  Sheriff Arpaio, and Maricopa County for Summary Judgement Based Upon Qualified

17  Immunity, doc. 51, is **GRANTED** in part and **DENIED** in part.

18         **IT IS FURTHER ORDERED** that the Defendants' Motion for Summary

19  Judgment, doc. 51, is **GRANTED** in favor of Defendant Arpaio on Count One and

20  Defendants Kent and Woolf on Plaintiff's allegations in Count One that the Deputies

21  lacked reasonable suspicion to conduct a traffic stop.

22         **IT IS FURTHER ORDERED** that the Defendants' Motion for Summary

23  Judgment, doc. 51, is **DENIED** as to Plaintiff's Fourth Amendment claims that

24  Defendants Kent and Woolf lacked probable cause to arrest her and used excessive force

25  in effectuating her arrest.

26         **IT IS FURTHER ORDERED** that the Defendants' Motion for Summary

27  Judgment, doc. 51, is **DENIED** as moot as to Plaintiff's claims asserted against

28

Defendant Maricopa County in Count One.

Dated this 5th day of October, 2010.

Lawrence O. Anderson
United States Magistrate Judge